UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DYNELLE JOHNSON,

        Plaintiff,

v.

SONJA WILLIAMS, ET AL.,

        Defendants.

_____/

Case No. 15-13856

SENIOR U.S. DISTRICT JUDGE
ARTHUR J. TARNOW

U.S. MAGISTRATE JUDGE
DAVID R. GRAND

### ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [43]

Plaintiff filed a complaint on November 2, 2015 against Defendant

Wolverine Human Services, Incorporated (WHS) and individual Defendants Sonja

Williams, Domonique Cobb-Clements, Jonathan Howard, Michael Kennebrew,

Kristi Einem-Smith and Judith Fischer-Wollack.  Plaintiff, the adoptive mother and

personal representative of the estate of the deceased Aaron Cauvin, brings §1983

claims of deliberate indifference to Aaron's mental health issues against various

employees of the private non-profit treatment facility WHS. She also raises a

*Monell* claim against WHS and state claims of negligence, gross negligence,

willful and wanton misconduct, and wrongful death against WHS employees

Kennebrew, Howard, Williams, Cobb-Clements and vicarious liability/respondeat

superior and principal-agent relationship claims against Defendants WHS, Fischer-Wollack and Einem-Smith. [11].

Defendants filed a Motion for Summary Judgment [43] on October 3, 2016. Defendants responded [74] on January 27, 2017 and Plaintiff replied [75] on February 24, 2017. An initial hearing was held on the Motion on May 17, 2017. The Court ordered supplemental briefing and invited amicus briefing on the federal claims. Plaintiff and Defendants submitted supplemental briefs on July 12, 2017 [85, 86]. The Michigan Association for Justice and the Michigan Defense Trial Counsel submitted amicus briefs on July 12, 2017 as well [87, 88]. A hearing was held on August 31, 2017. For the reasons stated below, Defendants' Motion [43] is **GRANTED in part** as to the dismissal of Count VIII and the dismissal of all claims against Defendant Judith Fischer-Wollack and **DENIED in part** as to all other claims.

## FACTUAL BACKGROUND

Aaron Cauvin ("Aaron") was born on April 27, 1999. His birth parents had their parental rights terminated when Aaron was about four years old. Aaron and his brother N.C. were taken as foster children by Dynelle Johnson ("Johnson") in 2006. Two years later, Johnson adopted both Aaron and N.C., at the ages of nine and six respectively.

When Aaron turned fourteen, he began to act out in school and at home. He spoke of suicide, cut himself, and intentionally crashed a stolen car into a light pole. Aaron was hospitalized on numerous times for severe depression and suicide ideation. From October 3, 2014 through October 21, 2014, Aaron was admitted to StoneCrest Center, a Behavioral Hospital, and was considered to be a high risk of violence to himself and others, and to SafeHaus, Inc., a Children's Intensive Crisis Residential facility that monitors children for suicide ideation. Aaron was discharged on October 21, 2014 and returned to Johnson's home.

On October 29, 2014, Aaron's psychological situation had caused tensions to rise in the Johnson home, and Ms. Alisha Weatherby, a Child Protective Services ("CPS") specialist, removed Aaron from Johnson's home pursuant to an Order from the Macomb County Circuit Court. Ms. Weatherby is a social worker with a degree in psychology. She transported Aaron to WHS, and testified that, at the time he was admitted to WHS, she did not observe any evidence that Aaron was actively suicidal or exhibiting any signs of suicide ideation. [43-10]. She did inform Defendant Williams that Aaron had previously attempted to commit suicide. [74-16 at ¶¶3-6].

WHS is a non-profit child-care institution. Upon his intake, a packet was completed that indicated Aaron appeared to be in a good physical and emotional state, but presented an increased risk for suicide. [43-11]. It is undisputed that

WHS was made aware of Aaron's mental health history, and that he was recently hospitalized for a suicide attempt. [74-15; 74-16]. During the intake process, Defendant Williams was shown Aaron's self-inflicted cutting scars as well. [74-17]. Aaron's belt was listed on his clothing inventory, but was not taken from him, because it was not policy at the time to take belts from shelter clients. [74-18]. Aaron was placed in a room with exposed ceiling plumbing [74-19] on the orientation level.

On October 30, 2014, Defendant Cobb-Clements completed a PTSD checklist that inquired about Aaron's feelings in the past month, and a Mental Health Screening Form III, which sought information about Aaron's "entire life history, not just [his] current situation." [74-24, emphasis in the original]. In the PTSD checklist, Aaron indicated that he has been feeling emotionally numb and unable to love those close to him, and felt as if his future would be cut short. [74-23]. In the mental health screening form, Aaron indicated that he had been depressed for weeks at a time in the past, and has had thoughts about killing himself, and had previously attempted suicide. [74-24]. Defendant Cobb-Clements noted that she asked Aaron "if he was having current suicidal/homicidal ideations" and Aaron "denied any current ideations." *Id*. Defendant Cobb-Clements also noted that Aaron would have a follow-up with a psychiatrist and psychologist. [*Id*].

At 3:00 pm on October 30, 2014, Aaron entered his room for mandatory reflection time during the shift change. [74-29]. At the time, WHS' line of sight policy, as written, did not require that staff visually observe the clients every fifteen minutes. [74-30]. Aaron was not seen by a staff member until 3:30pm, when he asked if he had to stay in this room after completion of reflection time. He was told by Defendant Howard that it was up to him. [74-31]. Around that time, Defendant Williams observed Aaron poke his head out of the room, and she informed him that he needed to exit it. [74-32]. Defendant Williams did not wait to see if Aaron had actually followed her directive. *Id.*

Defendant Williams separated the children into two groups, with one going downstairs to the recreation room, while the other remaining in the third floor lounge. [43-13 at 6]. Defendant Kennebrew was informed that Aaron was assigned to the group of children staying in the lounge. [74-34]. Because of an error in the head count, Aaron was not identified as missing. Defendant Kennebrew reported that he looked through the bedroom windows to see if there were any missing children, however he later admitted that he realized that he could not see the entirety of the room though the window. [43-13 at 6].

While Defendant Kennebrew moved the children into a line to lead them downstairs, one of the residents commented that he had urinated on the new kid's bed. This resident entered Aaron's bedroom, and ran out, exclaiming "He's dead!"

[*Id*]. Aaron was found hanging from the exposed ceiling plumbing pipes.

Defendant Kennebrew yelled, "The new boy has a belt around his neck and I think

he's dead!" [74-36]. Defendant Kennebrew did not take Aaron's body down, nor

did he attempt any life-saving efforts.

ANALYSIS

## 1. §1983 CLAIMS

### a. STATE ACTOR

It is undisputed that WHS is a private, non-profit corporation. The issue of

whether a private corporation is a state actor, or acted under the color of state law,

as required by section 1983, is a threshold question of law for the Court to

determine. *Neuens v. City of* Columbus, 303 F. 3d 667, 670 (6th Cir. 2002). In the

Sixth Circuit, a private entity can qualify as a state actor under three different tests:

(1) the state compulsion test; (2) the symbiotic relationship, or substantial nexus

test; and (3) the public function test. *Wolotsky v. Huhn*, 960 F. 2d 1331, 1335 (6th

Cir. 1992). Plaintiff argues that the public function test is most applicable here to

establish WHS as a state actor.

THE PUBLIC FUNCTION TEST

To qualify as a state actor under the public function test, a private entity such

as Defendant must be performing a function that has been exclusively reserved for

the state. *Carl v. Muskegon Cty.*, 763 F.3d 592, 597 (6th Cir. 2014). These

exclusive functions have been narrowly cabined to include such activities as "holding elections, exercising eminent domain, and operating a company owned town." *Chapman v. Higbee Co*., 319 F.3d 825, 833 (6th Cir. 2003).

Defendants point out that there is no binding state law mandating that the state of Michigan house teenagers, like Aaron, who have been removed from their home. *See* M.C.L. § 400.18d (The county department of social welfare, upon authorization of the county board of supervisors, **may** operate an emergency receiving facility for the temporary care of homeless, dependent or neglected children) (emphasis added). Defendants state that these permissive regulations necessarily do not establish the state as the exclusive actor in these situations.

In response, Plaintiff cites *Meador v. Cabinet for Human Res.*, 902 F.2d 474, 476 (6th Cir. 1990), in which the Court observed that it had found that "due process extends the right to be free from the infliction of unnecessary harm to children in state-regulated foster homes," and cited approvingly cases that "analogize[d] the state's role in placing children in foster homes to the mental institution and prison settings in which state liberty has been clearly established for 'deliberate indifference' to the plight of individuals in detention." *Lintz v. Skipski*, 25 F.3d 304, 306 (6th Cir. 1994). This supports characterization of WHS as a state actor under the functional test, since the Sixth Circuit has found that context matters, and that care provided in a custodial setting is an activity traditionally

reserved to the state, which has absolute dominion over a detainee's treatment. *See, e.g.*, *West v. Atkins,* 487 U.S. 42 (1988); *Carl v. Muskegon Cty.*, 763 F.3d at 597.

Defendants counter, arguing that *Meador* relied on a Kentucky statute, which is distinct in material part from the Michigan statute at issue here. Thus, the Kentucky statute provides in pertinent part that "***the cabinet shall arrange*** for a program of care, treatment and rehabilitation of the children committed to it," and "***the cabinet shall be responsible*** for the operation, management and development of the existing state facilities for the custodial care and rehabilitation of children . . . ." Ky. Rev. Stat. Ann. § 605.100 (emphasis added). Defendants thus argue that this decision is not applicable to the matter at hand because Michigan law, as described above, does not mandate that the state handle custodial care of children exclusively.

It is instructive that *Lintz*, 25 F.3d at 305, which cited *Meador* approvingly for the proposition that "due process extends the right to be free from the inflicting of unnecessary harm to children in state-regulated foster homes," was a case that arose in Michigan, and concerned Michigan actors. Significantly, the Court did not distinguish the case based upon the Michigan law concerning custodial child-care, but rather directly applied the *Meador* precedent to conclude that the social workers were on notice. *Id.*

Plaintiff points out that the Michigan Social Welfare Act, as amended in 1973, provides that the state of Michigan shall provide services to children that include, in relevant part,

> . . . halfway houses, youth camps, diagnostic centers, state operated regional detention facilities, regional short-term treatment centers, group homes, and other facilities and programs established with the approval of the legislature to provide an effective program of out-of-home care for delinquent or neglected children committed to or placed in the care and custody of the department by probate courts, courts of general criminal jurisdiction, or, where provided by law, the voluntary action of parents or guardians.

Mich. Comp. Laws Ann. § 400.115(a). It also allows the state to include the use of private agencies such as WHS to protect children, by ". . . [e]nter[ing] into contracts necessary for the performance of its powers and duties and the execution of its policies." M.C.L. § 400.115a(1)-(f).

It is clear that the state law at issue is not materially different from the Kentucky law presented in *Meador*, and that the state should be considered an exclusive actor in caring for children, and, in that capacity, can contract with private organizations. Thus, Defendant can be considered a state actor, under the law established by this precedent, concerning the due process protections existing for harm occurring in foster homes.

Defendants argue that they cannot possibly be considered a state actor because, if they are, then individuals who take in children placed by DHS, such as relatives, could be considered state actors as well. This is not a persuasive since the

question has already been decided. In the context of children placed in foster-care homes, liability does not extend to the foster parents, but rather to the state actors, *i.e.* social workers. These individuals have placed the children in those homes, and have responsibility to ensure the safety of the children they place. *See, e.g.*, *Lintz*, 25 F.3d at 305 ("due process extends the right to be free from the infliction of unnecessary harm to children in state-regulated foster homes"); *Brown v. Hatch*, 984 F. Supp. 2d 700, 709 (E.D. Mich. 2013) (finding that foster parents are not state actors).

In this case, Aaron was placed into Defendants' care by a Court order. As observed by Plaintiffs in their supplemental brief, the Court order placed Aaron into protective custody and "placed [him]/returned [him] to the [DHS] for care and supervision and/or placed at [Macomb County Juvenile Justice center] pending his preliminary hearing." [85-4 at 3]. The DHS elected to place Aaron in the custody of Defendant WHS to ensure his care and safety, it was expected that the standard of care there would be equivalent to state requirements, since the state of Michigan has the responsibility to ensure appropriate care of children under the extensive scheme laid out under the Child Care Organizations Act and the Social Welfare Act. Therefore, WHS is a state actor under the terms of the public function test.

### b. APPLICABLE STANDARD FOR PLAINTIFF'S CONSTITUTIONAL CLAIMS

In the supplemental brief, Plaintiff argues that, in cases of involuntary civil commitment such as applied to Aaron, the Fourteenth Amendment due process protections are determined by whether Defendants' actions were based on accepted professional judgment, rather than a deliberate indifference standard applicable to a convicted criminal. *See Youngberg v. Romeo*, 457 U.S. 307, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982); *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 848 (6th Cir. 2002).

*Youngberg*, 457 U.S. at 309, involved a mentally disabled man, Nicholas Romeo, whose mother requested the Court involuntarily commit, because she was unable to control his violence or to otherwise care for him. The Court ordered Romeo committed to the Pennhurst State School and Hospital pursuant to the State's involuntary commitment provision. *Id.* at 310. Romeo suffered injuries at the hands of other residents, and his mother filed a suit against the facility, bringing §1983 claims under the Eighth and Fourteenth Amendments. *Id.* The Supreme Court concluded that the Fourteenth Amendment standard for involuntarily committed individuals was whether professional judgment in fact had been exercised.

*Terrance*, 286 F.3d at 848, was a case, brought by the father of an involuntarily committed mental patient, who had died in a state psychiatric

hospital. The Sixth Circuit ruled the decedent enjoyed Constitutional protections under the Eighth Amendment against cruel and unusual punishment, as well as Fourteenth Amendment due process clause. *Id.* Specifically, the Court held that under the Fourteenth Amendment, individuals subject to involuntary civil commitment enjoyed heightened protection, and civil liability against professional staff results when a decision "is such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id*. Because the Fourteenth Amendment duty to provide reasonable safety applies "when the State takes a person into its custody and holds him there against his will," Plaintiff argues that, since Aaron was placed by Court order into State custody at WHS without any personal input as to his placement, the heightened protections under the Fourteenth Amendment found in *Youngberg* and *Terrace* apply.

Here, Aaron was involuntarily removed from his home by a Court order when his adoptive parent indicated that she was unable to care for him due to violence and threats. Aaron had no control over the Court process or its placement decision. Therefore, the heightened protection under the Fourteenth Amendment applies to this case, rather than a deliberate indifference standard.

### c. CLAIMS AGAINST INDIVIDUAL DEFENDANTS

### i. JUDITH FISCHER WOLLACK

### 1. INDIVIDUAL CAPACITY

Defendant Fisher-Wollack is the CEO and designated licensee for the WHS. To be liable in an individual capacity for §1983 claims, it must be shown that Fisher-Wollack "either encouraged the specific incident of misconduct or in some other way directly participated in it." *Heyerman v. Cty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012) (citing *Hays v. Jefferson Cnty.*, 668 F.2d 869, 874 (6th Cir. 1982)). "At a minimum, a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id.*

Plaintiff alleges that there is a §1983 claim against Defendant Fischer-Wollack for her approval and authorization of a constitutionally deficient written line-of-sight policy, the lack of a site-specific suicide prevention policy, and a policy that allowed children to keep their belts unless they were determined to be actively suicidal. [85 at 26-27]. However, there are no citations to deposition testimony showing any personal involvement in the creation or authorizations of these policies, therefore this supports a *Monell* claim rather than individual liability.

Indeed, in the provided deposition excerpts, while Defendant Fischer-Wollack states she has "the responsibility of financial, policy, [and] administration" for WHS, there is no evidence that she was personally involved in reviewing the policies and/or had knowledge or approval of these policies. In fact, when directly questioned about the policies at Aaron's facility, she stated that she did not have personal knowledge about the policies and procedures and specific environments of the various facilities. [74-109]. Therefore, summary judgment is granted as to any §1983 claim against individual Defendant Fischer-Wollack.

## 2. OFFICIAL CAPACITY LIABILITY

Plaintiff seeks to bring a §1983 claim against Fischer-Wollack, in her official capacity, for failure to train. Courts treat an official-capacity suit seeking monetary damages as "an action against an entity of which an officer is an agent," because a Plaintiff who seeks "to recover on a damage judgment in an official-capacity suit must look to the government entity itself." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

In this case, Plaintiff brings claims against Fischer-Wollack in her official capacity as CEO of WHS, alleging that her official involvement allowing inadequate training, renders her liable for the alleged constitutional violations perpetuated by the other Defendants in their individual capacities. Because this suit is brought against the individual Defendant in an official capacity, and Plaintiff is

seeking monetary damages, the Court must treat the claim against individual Defendant Fischer-Wollack as a claim against the municipal entity of WHS. Indeed, the allegations against Fischer-Wollack in her official capacity mirror those brought against WHS, which are examined in section d of this Order, *infra* pp. 23-29. Therefore, summary judgment is granted on this claim, and all §1983 claims against Defendant Fischer-Wollack are dismissed.

### ii. KRISTI EINEM-SMITH

### 1. INDIVIDUAL CAPACITY

Defendant Einem-Smith is the Chief Administrator of the WDATC. Plaintiff alleges that her conduct substantially departed below the accepted professional judgment because she, *inter alia*, "permitted and encouraged a policy that did not require Aaron, a new admittee, to be placed on constant observation until he met with a Qualified Mental Health Professional," maintained a custom and practice of allowing untrained and undereducated Youth Care Workers to screen admittees for suicidal risk factors, failed to have or implement a site-specific suicide prevention policy, and allowed new admittees to keep their belts. [85 at 28-29].

To have individual liability, it must be shown that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Heyerman*, 680 F.3d at 647 (citing *Hays*, 668 F.2d at 874). Plaintiff has presented facts of which a reasonable juror could

determine that Defendant Einem-Smith encouraged and directly participated in the misconduct at issue. First, she personally received information set forth in the intake form that Aaron had a potential to harm himself and yet denied him constant observation. [85-43]. Secondly, she admits knowledge of the practice of unlicensed care workers who provided Aaron with screenings of his mental health condition, suicide risk factors, and suicidality. [85-44; 85-45]. Further, Defendant Einem-Smith, as the Chief Administrator of the facility, allowed a practice that did not require the removal of belts from recent admittees.

The fact-finder could find that these factual allegations constituted substantial departures from professional judgment, leading to the suicide of Aaron, in the context of the extreme disregard discussed above for a child with a known history of self-harm and suicide attempts. Therefore, summary judgment is denied as against Defendant Einem-Smith in her individual capacity.

## 2. OFFICIAL CAPACITY

As explained above, the claim against Defendant Einem-Smith in her official capacity is properly brought as a claim against the municipal Defendant, so this claim is dismissed.

### iii. DOMONIQUE COBB-CLEMENTS

Defendant Cobb-Clements is employed by WHS as a Facility Case Manager. In that capacity, she administered mental health screening to Aaron. The mental

health screening form employed in the instant case included guidelines that provided: "[i]t is strongly recommended that a qualified mental health specialist be consulted about any 'yes' response to questions 3 through 17." [85-47]. Aaron answered 'yes' to eight of these questions, and yet Defendant Cobb-Clements did not consult with a qualified mental health specialist. [85-48]. Plaintiff's expert Dr. Dvoskin stated that the actions of Cobb-Clements were grossly inadequate. Further, Defendant Cobb-Clements knew that Aaron indicated that he had been feeling emotionally numb, unable to love those close to him, and felt that his future would be cut short. [74-23].

In the mental health screening form, Aaron indicated that he had been depressed for weeks at a time in the past, has had thoughts about killing himself, and had previously attempted killing himself. [74-24]. While Defendant Cobb-Clements also noted that Aaron would have a follow-up with a psychiatrist and psychologist, no action was taken before Aaron killed himself. *Id.* Further, after speaking with Aaron's mother, Defendant Cobb-Clements also learned that Aaron:

        (1) Was adopted;
        (2) Was exposed to alcohol and drugs in utero;
        (3) Had been sexually abused as a young child;
        (4) Masturbated while watching Ms. Johnson in the shower;
        (5) Was expelled from school for selling drugs;
        (6) Stole the mayor's car and crashed it;
        (7) Was on juvenile probation;
        (8) Formerly was at the Macomb Juvenile Justice Center;
        (9) Had sexual encounters with other children;
        (10) Flashed his younger brother with his penis;

(11) Liked to watch pornography;
(12) Was physically aggressive towards his mother;
(13) Had a history of playing with fire;
(14) Had a history of animal cruelty, including breaking a small dog's leg; and
(15) Required mental health hospitalizations for depression.

[85 at 33; citing 85-49].

Considering the subjective knowledge of Defendant Cobb-Clements at the time, it is a question for the jury to determine whether her failure to reasonably conclude that Aaron posed a risk of suicide represented a substantial departure from professional judgment. Therefore, summary judgment is denied as to Defendant Cobb-Clements.

### iv. SONJA WILLIAMS

Defendant Sonja Williams is a Shift Coordinator, Supervisor, and Senior Youth Care Worker. She was in charge of Aaron's initial intake, and it was her responsibility to screen Aaron for suicidal ideations. [74-13 at 108-109]. During intake, Defendant Williams learned that Aaron was a cutter, was just removed from his family home by Court order, and had attempted suicide in the past. [85-50; 85-11; 85-51]. Further, she neglected to perform the required headcount following a shift change, which allowed Aaron to remain uncounted and missing. She also failed to inform Defendants Kennebrew and Howard about Aaron's psychological history, suicide attempt, self-cutting, or prior hospitalizations for depression. [85-53; 85-54]. Williams also assigned Aaron to Kennebrew's

supervision when it was known that he only had been employed as Youth Care Worker at WHS for three days, and knew or should have known that he was already supervising eight children, in direct violation of Michigan's mandatory staff-to-child ratio. [85-55; 85-56].

Considering the totality of the evidence, a reasonable fact-finder could determine that Defendant Williams substantially deviated from professional judgment in her treatment of Aaron at WHS by disregarding his risk of suicide. Summary judgment as to Williams is therefore denied.

### v. JONATHAN HOWARD

Defendant Howard was a Youth Care Worker responsible for supervising children. Defendant Howard allowed Aaron to remain in his room following the mandatory reflection time. [85-32]. This deviated from line-of-sight policy because, when he was in his room, blind spots ensured that Aaron would remain out of sight. Further, the line-of-sight policy was also violated, because that policy dictates that the group should not be spilt for any reason. [85-31]. By allowing Aaron to remain in his room, the group was in fact split. Further, Michigan requires that Youth Care Workers perform headcounts of children during a shift change, and if a group has been spilt. [85-53]. Therefore, Howard violated a state requirement by failing to perform a headcount. Moreover, by allowing Aaron to

remain in his room, Howard also violated the policy that new admittees, assigned to the orientation level like Aaron, are to be closely supervised. [85-64].

Finally, WHS Youth Care Workers are required to "read all documented charts and/or logbooks at start of shift." [85-63]. Aaron's chart detailed a reported attempted suicide, a history of self-cutting, and his recent hospitalization for depression. [85-11]. Howard testified that, not only did he fail to read Aaron's chart at the start of his shift, but that he never read any charts, and merely "focused more on the logbooks." [85-63].

Considering the evidence on a whole, a reasonable fact-finder could find that Defendant Howard departed substantially from professional judgment by violating line-of-sight policy by allowing Aaron to remain alone in his room, failing to do a head count, and not reviewing Aaron's charts. Accordingly, summary judgment is denied as to Howard.

### vi. MICHAEL KENNEBREW

Defendant Kennebrew was a Youth Care Worker at WHS assigned to supervise Aaron on the day he committed suicide. [85-55]. Defendant Kennnebrew was exceeding the allowed staff-to-child ratio when he supervised nine children, despite the fact that the ratio was one-to-four for shelter children such as Aaron, and one-to-seven for abuse/neglect residential children. [85-69]. Further, Defendant Kennebrew also violated the line of sight policy by failing to ensure that

Aaron remained in his line of sight. Defendant Kennebrew did not conduct the state mandated periodic room check, and therefore was unaware that Aaron was alone in his room. [85-52]. Moreover, Defendant Kennebrew admitted that there was a blind spot in the rooms because of the window, and that there was no way, without physically entering the room, to view Aaron in the closet area where he hung himself. [85-19]. Similar to Howard, in contravention of required policy, Kennebrew failed to review Aaron's intake documentation charts at the beginning of his shift.

Kennebrew should have known that, as a child who was new to the facility, Aaron was required to be supervised more closely than other children. [85-64]. However, he violated the line of sight policy, failed to perform room checks, significantly exceeded the staff-to-child ratio, and failed to supervise Aaron more closely than the other older residents in the lounge. Additionally, Michigan regulations, and Plaintiff's expert as well, indicate that workers should be trained in ligature cut down technique, and have the necessary tools available. On the day that Aaron killed himself, Kennebrew did not have access to cut down tools, and made no attempt to cut Aaron down or to provide any life saving efforts. [74-90; 74-36].

Kennebrew was assigned to supervise Aaron. As a result of the combination of factors discussed above, Aaron was left to his own devices in his room for an

undetermined amount of time. This unsupervised time enabled him to hang himself from the exposed pipes in his closet, and not to be discovered until he was, per Kennebrew, "blue." In fact, Aaron was only discovered when a fellow resident bragged about harassing him, and opened his room to show the fellow residents that he had in fact urinated on his bed. These actions led to the discovery of Aaron, and at no time did Kennebrew notice that his headcount was missing a child. He never committed a room check that would have enabled him to discover Aaron was alone in his room. There is a question for the jury of whether Defendant Kennebrew's actions substantially departed from professional judgment, and therefore summary judgment is denied as to Kennebrew.

### d. THE MONELL CLAIM

To show that a policy or custom led to an alleged violation of their civil rights, a Plaintiff can identify one of the following: "(1) the municipality's legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance of acquiescence of federal violations." *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015), *cert. denied*, 136 S. Ct. 1381, 194 L. Ed. 2d 361 (2016). Further, Plaintiff must also show that, "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged . . . and must demonstrate a direct causal link between the municipal action and the deprivation

of federal rights." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). To show that a training program violates substantive due process, a Plaintiff must show "(1) that the training program was inadequate for the tasks that officers must perform, (2) that the inadequacy was the result of the city's deliberate indifference, and (3) that the inadequacy was 'closely related to' or 'actually caused the . . . injury.'" *Criswell v. Wayne Cty., Kentucky*, 165 F.3d 26, *5 (6th Cir. 1998).

Plaintiff argues that WHS violated the 14th Amendment in several ways, first alleging that there was inadequate training; and next asserting there was a policy, practice and custom of: (1) placing children in their rooms for reflection time without conducting 15-minute visual checks; and (2) not removing belts from children during the intake process, including children with suicide risk factors. Plaintiff also points to WHS' failure to have and implement a suicide prevention policy at the Wolverine Diagnostic Assessment and Treatment Center ("WDATC"). As detailed below, Plaintiff has shown evidence from which a finder-of-fact reasonably could conclude that WHS violated the 14th Amendment due process clause, due to a substantial departure from accepted professional judgment.

### i. INADEQUATE TRAINING

Per the State of Michigan's Suicide Prevention Policy for youth taken into

residential facilities:

> All staff who routinely work with youths are trained in the
> identification and management of suicidal youth. The initial training
> will be a minimum of eight (8) hours and annual refresher training
> will be a minimum of two (2) hours. Response drills will be part of
> the training.

[74-90 at 2]. WHS argues that their staff was trained, presenting testimony from

Mr. Barr, the State of Michigan licensing consultant, that "during orientation some

training on suicide is always provided to every direct care worker." [75-2 at 151].

However, the testimony of the individual Defendants, and of WHS Senior Vice

President Mr. McCree, calls into question whether the Defendants actually

received the state required suicide training.

First, Mr. McCree testified that the training records for the individuals would

show whether or not the required annual training was provided, and that he would

defer to the accuracy and completeness of those logs as to whether an employee

attended suicide prevention training. [85-23 at 117]. When the training records for

the individual Defendants are examined, there is no indication that the individuals

received even a single training session on suicide prevention, let alone annual

training. [85-24; 85-26; 85-27; 85-28]. Per the training log, only Defendant

Williams received a single suicide assessment and intervention training of 2 hours on April 19, 2007, which she could not recall [85-26 at 19; 74-111 at 88].

This creates a question of fact for the jury as to whether the required training on suicide identification and intervention provided for employees at WHS was inadequate. Further, the fact that none of the named Defendants appear to have received any of the required training further points to a systematic indifference towards the training of staff that come into contact with children who are at risk for suicidal tendencies.

Further, this lack of training is "closely related to" or "actually caused the . . . injury" of Aaron's suicide since he remained unwatched and retained his belt, despite his known history of suicidal tendencies. Moreover, his obvious depressed state of mind after being given up by his adoptive mother, and his feeling that his life would be cut short, should have trigged an appropriately enhanced treatment from the individual Defendants. *See Criswell*, 165 F.3d 26. Therefore, summary judgment is denied as to the *Monell* claim, as related to a practice of inadequate training.

ii. PLACING CHILDREN IN THEIR ROOMS FOR REFLECTION TIME WITHOUT CONDUCTING 15-MINUTE VISUAL CHECKS

Michigan Admin. Code R. 400.4127 required that:

When residents are asleep or otherwise outside of the direct supervision of staff, staff shall perform variable interval eye-on

checks of residents. The time between the variable interval checks shall not exceed 15 minutes.

[85-29]. It is undisputed that, at the time of Aaron's suicide, the written policy at WHS did not include a requirement for staff to perform 15-minute checks on children when they were in their bedrooms. [85-30; 85-31]. The Michigan Welfare Licensing Consultant who investigated Aaron's suicide stated that WHS' line-of-sight policy fell well below the minimum standard required by the State of Michigan. [85-32; 85-33; 85-34]. This deliberate choice of policy was extremely deficient, and was a direct causal link to Aaron's suicide. He was left alone in his room for an undetermined length of time, out of sight, in the area where he hung himself, when he was known as someone with a history of suicide who felt that his life was going to be cut short. The time he was left unwatched was long enough for him to get up, hang himself, and die, well before anyone found him. This is clearly a policy that moves beyond mere negligence, and Plaintiff has established this policy as being constitutionally deficient.

### iii. NOT REMOVING BELTS FROM CHILDREN DURING THE INTAKE PROCESS, INCLUDING FROM CHILDREN WHO HAVE SUICIDE RISK FACTORS

Per the State of Michigan's policy, while removal of a youth's clothing is avoided whenever possible during the intake process, this excludes the removal of belts and shoelaces. [85-22]. At the time of Aaron's suicide, WHS did not have a policy to remove belts or shoelaces. [85-36]. WHS employees were only instructed

to remove belts if they believed the children were considered a suicide risk or risk to harm others. [85-37; 85-38]. This policy, in direct violation of the State of Michigan's policy, left the decision to remove belts based on the untrained opinions of staff concerning the risk of suicide that a child presented at intake. This is a situation in which a finder-of-fact reasonably could conclude that this policy represented a substantial departure from professional judgment that led to Aaron hanging himself in his closet with his belt. Therefore, summary judgment is denied as to this policy.

### iv. FAILURE TO HAVE AND IMPLEMENT A SUICIDE PREVENTION POLICY

The State of Michigan required each facility to "develop and implement standard operating procedures (SOPs) pertaining to suicide prevention." [85-22]. It is undisputed the WDATC facility in which Aaron was placed did not have a site-specific suicide prevention policy. [85-35]. Further, while Defendants state that they had an overarching suicide prevention policy, it is unclear what that actual suicide prevention policy in fact was. [74-96]. Defendants' response brief identifies Plaintiff's exhibit 89 as the suicide prevention policy. [75 at Pg Id 32]. However, that policy is the State of Michigan DHS requirements for facilities, as described and referenced above, and does not qualify as the facility's SOPs. Further, as described above, the facility in which Aaron was placed did not comply with the requirements of this policy in many respects, and there is an extreme

failure in implementation of the required policy, leaving children such as Aaron vulnerable. Even if this was considered a policy specific to the WDATC, there is no evidence that any of the line-staff who were in close contact with the children at the facility were even aware of the policy, or had access to it. [74-167]. A finder-of-fact could find that the failure to have and implement a suicide prevention policy represented a substantial departure from professional judgment, leading to the suicide of Aaron.

### e. QUALIFIED IMMUNITY

If the Court determines that Defendants are to be treated as state actors, there is disagreement between the parties whether they would enjoy the qualified immunity of actual state parties, since they are merely imputed to be state actors. When assessing whether private parties deemed state actors possess the qualified immunity available to actual state parties, a Court must "consider both the purposes of qualified immunity protection and the nature of the relationship between the state and the putative private party." *Bartell v. Lohiser*, 215 F.3d 550, 556 (6th Cir. 2000). "[A] private party may not assert qualified immunity when the incentives for a particular government function are fundamentally inconsistent with the foregoing purposes of qualified immunity protection." *Id*.

Plaintiff argues that the immunity in this case should be analogized to private prison cases in which the Supreme Court has found prevailing economic

incentives for private actors providing services, in the penological context, to "essentially render qualified immunity protection superfluous." *Id.* at 557 (citing *Richardson v. McKnight*, 521 U.S. 399, 409-10 (1997)).

Defendants, in turn, argue that the *Bartell* decision is appropriate here. That case concerned a non-profit organization that contracted with a state social services agency for the provision of foster care services, and which instituted proceedings ultimately to terminate parental custodial rights. *Id.* at 553. In granting qualified immunity in that case, the Court noted the close supervision of the actions of the non-profit by the state, as well as the fact that the act of providing foster care services concerned "[d]ecisions pertaining to the welfare of a child, which may, as in this case, result in the termination of the natural bond between parent and child, require the deliberate and careful exercise of official discretion in ways that few public positions can match." *Id.* at 557.

The Court believes that *Bartell* is distinguishable from this case. In *Bartell*, the state was closely involved in directly supervising the actions of the private actor; including appointing a caseworker to "monitor the appropriateness and sufficiency of [the private actor's] foster case plans" and specifically approving the plans for the child at issue in the case. *Id*. In contrast, here, once Aaron was handed off to WHS, while it was providing an exclusive function of the state as described above, there was no further direct involvement by the state; rather the decisions

were made, under WHS' policy, by their employees. Importantly, the policies employed by WHS were not up to state standards, which is indeed a significant element underlying the theory of Plaintiff's complaint. Therefore, there was no approval and monitoring by the state of the treatment of Aaron, or of any of the other children housed by WHS. There is certainly no evidence before the Court of any close supervision on a level similar to that in *Bartel*.

Moreover, importantly, *Bartel* dealt with Defendants who were social workers in charge of placement decisions, and who petitioned the Court to terminate the parental rights of Bartel. *Id.* at 554. As the Court pointed out, the decision to terminate the parental relationship are too important to encumber a necessarily delicate decision making process with the threat of litigation. Therefore, the purpose of qualified immunity was best served through its extension to the private actors in *Bartel*. *Id.* at 556.

In effect, the private actor in that context was taking action to prevent the child from being harmed. In contrast, in this case, the private actor had no role in the removal of the child from parental custody, and it is not alleged that WHS would ever, in any circumstance, play that role with any child in its care. Rather, it housed the children, and was charged with ensuring their safety. This is especially relevant since the majority of the Defendants have only a GED, and consequently have no relevant training in social work. The nature of the incident in this case, and

the role of the Defendants in the child-care functions of the state, are vastly different from those in *Bartel*. In the case of Aaron, Defendants tragically failed their role to ensure the safety of a resident, and indeed were a direct contributing cause in his death. Considering the significant differences between the two cases, the Court is not persuaded that *Bartel* mandates that the Court find qualified immunity applies.

This is a case in which the prevailing economic incentives for WHS to provide services in the child care context "essentially render qualified immunity protection superfluous." *Id.* at 557 (citing *Richardson*, 521 U.S. at 409-10)). WHS was bound by at least ten contracts with the state in 2014. [74-41]. These contracts netted WHS around $25 million in compensation during 2014. [74-42]. If WHS failed to fulfill the terms and conditions of the contract, which are directly relevant to state licensing standards, the contract could be revoked. [74-43]. These facts are more closely analogous to the numerous decisions in the penological context, which find private actors ineligible for the protections provided by qualified immunity. *See, e.g.*, *Harrison v. Ash*, 539 F.3d 510, 521-25 (6th Cir. 2008) (finding nurses employed by a contractual medical provider have no immunity from liability for deliberate indifference to a prisoner's medical needs).

Similar to the analysis in *Harrison*, there is no intimation here that WHS is not competitively involved in the state contracted housing of children in Michigan.

Further, there are no facts presented in this case, in which a child committed suicide in a private facility amid acts of extreme departure from professional judgment, and inadequate training and policies, that a lack of qualified immunity will deter qualified individuals and corporate entities from being involved in the housing of children in facilities similar to WHS. Indeed, there is no indication that distraction caused by the threat of lawsuits in the absence of immunity would be greater than the threat of malpractice and negligence suits that face Defendant here. Therefore, the Court finds that Defendants are not entitled to qualified immunity. This ground for summary judgment is denied.

## 2. STATE LAW CLAIMS

### a. CAUSATION AND SUICIDE

With respect to the state law claims, Defendants argue that Plaintiff has not provided evidence that meets the causation requirements under state law for suicide cases. Defendants cite *Teal v. Prasad*, 283 Mich. App. 384, 393, 772 N.W.2d 57, 62 (2009), in support of the proposition that, to establish causation under Michigan law for suicides, there must be evidence demonstrating the mental state, thoughts, and suicidal tendencies of the deceased prior to the actual suicide.

*Teal* concerned a suicide occurring one week after discharge from the hospital. *Id.* Michigan Courts have clarified that an important factor in that case was the fact that the "temporal and causal connection [were] more attenuated."

*Estate of Pace v. Hurley Med. Ctr.*, No. 328584, 2017 WL 378732, at *6 (Mich.

Ct. App. Jan. 26, 2017). This case is easily distinguishable. Here, Aaron committed

suicide while still under the care and supervision of Defendant, leaving no

temporal problems with the causation. Therefore, evidence of mental state and

suicidal tendencies of Aaron at WHS is not required.

### b. NEGLIGENCE CLAIMS AGAINST DEFENDANTS KENNEBREW, HOWARD, WILLIAMS AND COBB-CLEMENTS

The Court refers to the analysis of the individual §1983 claims concerning

Defendants Kennebrew, Howard, Williams, and Cobb-Clements above in section

1(b). Considering the totality of the evidence, as examined above, there exists a

legitimate question of fact whether Defendants' negligent acts were the proximate

cause of the suicide and summary judgment on Count VII is denied.

### c. STATE IMMUNITY

Under Michigan law, state immunity for individuals alleged to have

committed negligent acts is determined by the following process:

> (1) Determine whether the individual is a judge, a legislator, or
> the highest-ranking appointed executive official at any level of
> government who is entitled to absolute immunity under MCL
> 691.1407(5).2
>
> (2) If the individual is a lower-ranking governmental employee
> or official, determine whether the plaintiff pleaded an
> intentional or a negligent tort.
>
> (3) If the plaintiff pleaded a negligent tort, proceed under MCL
> 691.1407(2), and determine if the individual caused an injury or

damage while acting in the course of employment or service or on behalf of his governmental employer and whether:

> (a) the individual was acting or reasonably believed that he was acting within the scope of his authority,

> (b) the governmental agency was engaged in the exercise or discharge of a governmental function, and

> (c) the individual's conduct amounted to gross negligence that was the proximate cause of the injury or damage.

*Odom v. Wayne Cty.*, 482 Mich. 459, 479-80, 760 N.W.2d 217, 228 (2008).

Plaintiff argues that under Michigan law, private actors are not entitled to immunity, because they are not government officials or employees under state law. While immunity may be extended to private actors under state law, the Courts have been clear that:

> A private entity's performance of a governmental function does not confer governmental agency status on that entity. As noted in *Ross v. Consumers Power Co.*, 420 Mich. 567, 363 N.W.2d 641 (1984)], p. 616, mental health services, albeit required of a governmental agency, are commonly provided by private facilities. The Mental Health Code expressly contemplates the participation of both public and private mental health facilities in state and county community mental health programs.

> Notwithstanding its performance of a "governmental function" and its reliance on public funding, New Center retains its identity as a nongovernmental entity. Its employees are not county employees. It retains its separate corporate identity and is governed by its own board of directors. Except as it has voluntarily obligated itself by contract, New Center is not required to provide services or to remain in existence. While it may have been created in response to the recognition of mental

health needs in Detroit, New Center's creation was not mandated by law.

We are persuaded of no reason to treat a private entity as a governmental agency merely because that entity contracts with a governmental agency to provide services, which the agency is authorized or mandated to provide.

*Jackson v. New Ctr. Cmty. Mental Health Servs*., 158 Mich. App. 25, 35, 404 N.W.2d 688, 692-93 (1987); *see also Fareed v. G4S Secure Sols. (USA) Inc.*, 942 F. Supp. 2d 738, 748 (E.D. Mich. 2013) (collecting cases that demonstrate the well-established line of authority that the performance of a public function by a private entity does not warrant extending governmental immunity to the private entity); *Roberts v. City of Pontiac,* 176 Mich. App. 572, 578, 440 N.W.2d 55, 57 (1989) (finding "no reason to extend the protection of governmental immunity to a private entity merely because it contracts with the government.").

Similar to these cases, Defendant WHS is a private, non-profit organization that, notwithstanding the contractual relationship with the state and its exercise of a state function, retains its separate corporate identity from the state. *See, e.g.*, *Jackson*, 158 Mich. App. at 35. Therefore, the Court finds that state immunity does not apply to WHS, or to its employees before the Court as individual Defendants. Further, even if state qualified immunity applied, given the analysis above of the individual claims, the Court believes that Plaintiff has met the burden of gross negligence on these claims.

### d. PARENTAL/FOSTER PARENT IMMUNITY

Defendants ask the Court to extend the Michigan Foster Parent Qualified Immunity Statute to Defendants, private actors, while the statute previously has been available only to foster parents under the statute. *See* M.C.L. § 722.163. Defendants appropriately admit that they are asking the Court answer a question of first impression. Judicially extending the reach of state statutes to extend immunity is inappropriate for a federal court acting under supplemental jurisdiction. Therefore, the Court declines to extend immunity to the Defendants under the Michigan Foster Parent Qualified Immunity Statute.

### e. DAMAGES AND THE MICHIGAN WRONGFUL DEATH STATUTE

Defendants request summary judgment on all damage claims, above and beyond those allowed under Michigan's Wrongful Death Statute, arguing that damages for Plaintiff's expectancy of support from her son are inappropriate. They argue that the statute limits Plaintiff's damages to expenses stemming from funeral, burial and medical expenses incurred on the date of death. M.C.L. § 600.2922.

The Michigan Courts addressed the question of children and expectancy damages under the wrongful death statute in *Setterington v. Pontiac Gen. Hosp.*, 223 Mich. App. 594, 606-07, 568 N.W.2d 93, 99 (1997). In that case, the Court endorsed the decision of *Thompson v. Ogemaw Co. Bd. Of Rd. Comm'rs*, 357

Mich. 482, 98 N.W. 2d 620 (1959), the use of which the Plaintiff urges and Defendants deride. In *Setterington*, the Court stated that pecuniary damages suffered by the surviving parents of a minor child could in fact extend beyond the child's minority. 223 Mich. App. 594, 606-07. The Court held that the Wrongful Death statute in no way limits those damages to the minority. *Id.* at 607.

While the opinion acknowledged that the "pecuniary injury" language of the statute at issue under *Thompson* had since changed to "loss of financial support," the Court found these terms to be analogous. *Id.* at 606-07. It reasoned that the Legislature was presumed to act with knowledge of statutory interpretations of the appellate courts, and therefore the current wrongful death statute covered those same damages accepted in *Thompson,* since there was no limiting language in the current statute. *Id*.

The test for these damages is "expectation of support." *Thompson*, 357 Mich. at 489 (1959). Defendants contend that there is no evidence that Aaron provided any services to Plaintiff, and therefore there is no reasonable expectation that Aaron would have given his adoptive mother any support in the future. This is a question of fact that is appropriate for the jury to resolve. If the Defendants do not believe Plaintiff's statements, or find them lacking in credibility, this issue can be heard and determined by a jury. As a result, summary judgment on this issue is denied.

### f. COMPARATIVE NEGLIGENCE AND SUICIDE

Defendants argue that comparative negligence should foreclose Plaintiff's state claims, because suicide, by definition, is 100% the fault of the person who intentionally commits the act in question. As a result, Defendants argue that, under Michigan comparative negligence rules, Plaintiff's state negligence claims should be dismissed because no jury would believe that Aaron was less than 50% responsible for his death. M.C.L. § 600.2959.

Defendants cite *Mission v. Corbett*, No. 294905, 2011 Mich. App. LEXIS 359 (Feb. 17, 2011) (unpublished) and *Peterson v. Corder*, No. 251127, 2005 Mich. App. LEXIS 234, 2005 WL 234391 (Mich. Ct. App. Feb. 1, 2005) (unpublished) to support their proposition. However, these cases are easily distinguishable, as they concern instances in which there is no suicide considered. *Peterson* considered an act that was negligent and unlawful, while *Mission* dealt with a gutter cleaner who had been warned and given safety equipment that he did not in fact elect to use. These are obviously significantly different circumstances than those presented in the case at bar.

Further, *Hickey v. Zezulka*, 439 Mich. 408, 443-44, 487 N.W.2d 106, 121 (1992), as amended on denial of reh'g (July 13, 1992), is instructive. In *Hickey*, the Court held that, for a jailhouse suicide, a negligent defendant cannot mitigate damages by pleading that a Plaintiff, to whom a duty was owed, violated a

standard of care for their own protection. *Id.* at 443-44. While Defendants argue that this holding is only applicable to jailhouse suicides, the reasoning is applicable to this case because the Court relied on the fact that a jailhouse suicide involved a Defendant who "has a duty to give aid to and protect another person in the defendant's custody, even from his own intentional acts." *Id.* Defendants cannot point to a case from Michigan that would preclude application of this reasoning in this case, where Defendants had a similar and unquestioned duty to provide aid and protection to Aaron while he was under their custody. Therefore, a comparative negligence instruction is denied.

### g. MEDICAL MALPRACTICE STATUTE

Defendants argue that summary judgment should be granted as to the state law negligence claims against the two individual Defendants who are licensed social workers, and to WHS, which is a licensed healthcare facility, because Plaintiff failed to comply with the substantive requirements for Michigan medical malpractice claims. Plaintiff replies, first arguing that the Court should find these requirements to be procedural, and thus inapplicable in the federal court case under Federal Rule of Civil Procedure 8(a). *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). The Court has previously considered this precise issue and held that these requirements are in fact substantive. *See Bade v. United States*, No. 11-10780, 2012 WL 1555072 (E.D. Mich. May 1, 2012). The Court is not persuaded that

these requirements are procedural, in the face of Michigan Court holdings and the previous analysis under *Erie*, which concluded that the requirements are substantive, would be outcome determinative, encourage forum shopping, and lead to inequitable administration of law. *Id.* at *8-10. Therefore, the Court finds that the medical malpractice filing requirements are substantive, and Counts VIII and VI must accordingly be dismissed against all Defendants for the failure to comply with the medical malpractice filing requirements imposed by M.C.L. §§ 600.2912b and 600.2912d.

Plaintiff also argues that, if the Court finds these requirements to be substantive, the expert report provided to Defendants before Plaintiff's complaint was filed should be found to satisfy that condition. In support of this proposition, Plaintiff cites *Ericson v. Pollack*, 110 F. Supp. 2d 582, 589 (E.D. Mich. 2000); *Broder v. Corr. Med. Servs., Inc.*, No. 03-75106, 2008 WL 704296, at *21 (E.D. Mich. March 14, 2008); and *Derfiny v. Bouchard*, 128 F. Supp. 2d 450 (E.D. Mich. 2001).

However, these cases are not applicable here, as they found that the expert report satisfied the requirements of an affidavit of merit under M.C.L. § 600.2169. There is no persuasive argument that the expert report in this case satisfies those conditions. Under M.C.L. § 600.2169(1)(a), the standard of care expert must specialize in the same area as the practitioner they are testifying against. Further,

the expert must practice in the same health profession and/or teach in that same profession. M.C.L. § 600.2169(1)(b)-(c). A forensic psychologist authored the expert report in this case. He has no social work degree, and further has no social work license. Therefore, under M.C.L. § 600.2169, he is not an expert qualified to produce an affidavit of merit.

Finally, Plaintiff argues that her allegations should not be treated as medical malpractice claims, because no expert testimony is required to determine whether Defendants' employees' actions were negligent. Plaintiff relies upon *Jones v. Corr. Med. Servs., Inc.*, 845 F. Supp. 2d 824, 846 (W.D. Mich. 2012) (citing *Bryant v. Oakpointe Villa Nursing Ctr.*, 471 Mich. 411, 430-31, 684 N.W.2d 864, 871 (2004)), for the proposition that, because the claims relate to an accusation that Defendant did nothing in response to a known risk, a jury does not require expert testimony to determine if there was negligence, and can instead resolve the claims as a matter of common sense.

However, Plaintiff's accusations cannot be resolved as a matter of common sense, as the briefs themselves demonstrate. Many of the accusations against these Defendants surround questions of hiring, training, and adequacy of policies that are not in fact framed as accusations of mere inaction. The Michigan courts have held that hiring decisions and patient monitoring "involve questions of professional medical management and not issues of ordinary negligence that can be judged by

the common knowledge and experience of a jury." *Dorris v. Detroit Osteopathic Hosp. Corp.*, 460 Mich. 26, 46-7, 594 N.W.2d 455, 465-66 (1999).

Finally, Plaintiff argues that the claims at issue are not subject to medical malpractice standards, because they are gross negligence claims rather than medical malpractice claims.[1] However, Defendant correctly asserts that gross negligence claims no longer are independent causes of action under Michigan law, since the Courts have repudiated contributory negligence principles and adopted comparative negligence. *See, e.g.*, *Jennings v. Southwood*, 446 Mich. 125, 149, 521 N.W.2d 230, 241 (1994); *Cummins v. Robinson Twp.*, 283 Mich. App. 677, 690-91, N.W.2d 421, 433 (2009); *Van Vorous v. Burmeister*, 262 Mich. App. 467, 687, N.W.2d 132, 143 (2004). Rather, gross negligence exists as a way to plead around state imposed qualified immunity, as explained above, and to establish caps on damages. *See* M.C.L. § 691.4107; M.C.L. § 600.2946a. Thus, while gross negligence is an important substantive concept under Michigan law, there is no

---

[1] Plaintiff does not cite any Michigan case law to support this argument. Rather Plaintiff cites to *Stojcevski v. Cty. of Macomb*, 143 F. Supp. 3d 675, 692-93 (E.D. Mich. 2015), *reconsideration denied*, No. CV 15-11019, 2016 WL 2893016 (E.D. Mich. May 18, 2016). However, this case cites approvingly a decision that the gross negligence claim at issue in the case was a medical malpractice claim. *Id* at 693. While that Court did not dismiss the claim, it was on the grounds that it found the medical malpractice claim statutory requirements to be procedural. As explained above, the Court does not agree with this analysis, and therefore this decision is not persuasive.

independent cause of action for gross negligence. Therefore, Defendants are correct that there are no viable claims of gross negligence in this case.

Accordingly, summary judgment is granted on the state law claims in Count VIII against the two licensed social workers, Ms. Einem-Smith and Ms. Fischer-Wollack and WHS.

**IT IS ORDERED** that Defendants' Motion [43] is **GRANTED in part** as to the dismissal of Count VIII and the dismissal of all claims against Defendant Judith Fischer-Wollack and **DENIED in part** as to all other claims.

**SO ORDERED**.


s/Arthur J. Tarnow
Arthur J. Tarnow
Dated: September 25, 2017          Senior United States District Judge